# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JOHN CAMPANELLI and MARY
CAMPANELLI,

          Plaintiffs,

          v.

THE COFFEE RUN CONDOMINIUM
COUNCIL, an unincorporated association,
and THE COFFEE RUN
CONDOMINIUM COUNCIL INC.,
a Delaware corporation,

          Defendants.

) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 
) 

**C.A. No. 2018-0391-JRS**

## MEMORANDUM OPINION

Date Submitted: April 29, 2021
Date Decided: July 23, 2021

Nicholas G. Kondraschow, Esquire and William J. Rhodunda, Jr., Esquire of Rhodunda, Williams & Kondraschow, Wilmington, Delaware, Attorneys for Plaintiffs John Campanelli and Mary Campanelli.

Thomas C. Marconi, Esquire of Losco & Marconi, P.A., Wilmington, Delaware, Attorney for Defendants The Coffee Run Condominium Council and The Coffee Run Condominium Council Inc.

**SLIGHTS, Vice Chancellor**

George Herbert Walker Bush was President of the United States when Plaintiffs, John and Mary Campanelli (together, "Plaintiffs" or the "Campanellis"), purchased the right to construct a building ("Building A") in the Coffee Run Condominium complex (the "Condominium") in New Castle County, Delaware. Building A has yet to be constructed. The Campanellis would like to build it, but Defendants, The Coffee Run Condominium Council and The Coffee Run Condominium Council, Inc. (together, "Defendants" or the "Council"), do not approve of the proposed plans under which construction would proceed.

The Council's authority to govern the Condominium flows from a code of regulations (the "Code of Regulations") and a declaration (the "Declaration," and together with the Code of Regulations, the "Governing Documents"). After decades of inactivity, in or around 2015, the Campanellis submitted several designs and proposals for the construction of Building A to the Council. The Council rejected all of the submissions for the stated reason that none complied with the Condominium's declaration plan (the "Declaration Plan"). Soon after, as if awakened from a decades-long slumber by the Campanellis' sudden burst of activity, the Council notified the Campanellis that they would be charged their purported share of the Condominium's common element expenses going forward and for the year prior to the notice. The Campanellis filed this action shortly thereafter.

1

Following limited discovery, the parties have cross-moved for summary judgment on four issues: (1) whether the Campanellis are required to pay condominium fees for units yet to be built; (2) whether the Council's rejection of the Campanellis' current building proposal is valid; (3) whether Building A, once constructed, should be subject to separate accounting and billing; and (4) whether the Campanellis' may recover their attorneys' fees as a result of the Council's conduct during this litigation.[1] After careful review of the record, I have determined that: the Campanellis do not owe condominium fees for unbuilt units; the Council's rejection of the Campanellis' building proposal is invalid; and the Campanellis are entitled to separate accounting and billing, as requested, for Building A's "maintenance with the new building owners being responsible for all maintenance, repairs and upkeep of the new building and the existing unit owners being required for all maintenance, repairs and upkeep of the existing buildings." The Campanellis, however, are not entitled to reimbursement of their attorneys' fees. My reasoning follows.

---

[1] D.I. 41 (Defs.' Opening Br. in Supp. of Mot. for Partial Summ. J.) ("Defs.' Opening Br.") at 6. I note that Defendants' motion is for partial summary judgment because, in the event the Court determines the Campanellis must pay damages or fees to Defendants, further proceedings may be necessary to determine the actual amount owed.

## I. BACKGROUND

The facts are drawn from the documentary record and affidavits presented by the parties for purposes of summary judgment. As explained below, there are no genuine issues of material fact.

### A. The Parties

Plaintiffs, John and Mary Campanelli, are residents of Delaware and owners of the right to construct Building A within the Condominium.[2] Defendant, The Coffee Run Condominium Council, is an unincorporated association with its principal place of business in Delaware.[3] Defendant, The Coffee Run Condominium Council Inc., is a Delaware corporation.[4]

### B. Coffee Run Condominium Breaks Ground

A record land development plan (the "Record Plan" and, together with the Declaration Plan, the "Condominium Plan") for Coffee Run, approved in 1972, contemplated the contemporaneous construction of five condominium buildings (Buildings A–E), Building F/a model unit ("Unit F-1-A") and a community center with pool.[5] All buildings were constructed in 1976 except for Building A, which

---

[2] D.I. 1 (Verified Compl. Seeking Decl. J. and Inj.) ("Compl.") ¶ 1.

[3] Compl. ¶ 2.

[4] Compl. ¶ 3.

[5] D.I. 1, Ex. A (Record Plan dated May 30, 1972).

was delayed due to ongoing sewer work.[6]  The Condominium is governed by the Council and was constructed according to the Declaration Plan, recorded with the New Castle County Recorder of Deeds on or about September 21, 1973.[7]

The Campanellis purchased the rights to construct Building A in 1990,[8] at which time there were "no common expenses due and owing" on the building.[9] Their purchase decision was informed, in part, by the Council's representation on November 9, 1989, that the Council would "commence condominium fees and sewer charges for [Building A's] 45 [unconstructed] Units at such time that services from the present Coffee Run facility are utilized by Building A to any degree."[10]  The Council also informed the Campanellis that the construction of Building A must comply with the specifications in the Condominium Plan.[11]

---

[6] D.I. 1, Ex. A; D.I. 42, Ex. C.

[7] D.I. 42, Ex. C (Declaration Plan dated September 21, 1973).

[8] D.I. 42, Ex. A (The Deed conveying Building A to the Campanellis).

[9] D.I. 42, Ex. G (The Rice Letter, dated Nov. 9, 1989).

[10] *Id.*

[11] *Id.* ("It is our intention to assure that the recorded plans and specifications on file for the construction of Building A are complied with completely.").

## C. The Governing Documents

The Condominium is governed by the Declaration and the Code of Regulations.[12] The Declaration, in turn, is governed by the Delaware Unit Property Act (the "DUPA"),[13] and its original form required that the Condominium be used only for residential purposes.[14] On June 15, 1978, the Declaration was amended to permit Unit F-1-A to be used as a commercial office and to allocate at least twelve parking spaces to Unit F-1-A.[15] On or around December 30, 1991, after the Campanellis had purchased the right to construct Building A, the Declaration was amended again to clarify that the owners of all 226 units in the Condominium, including the 45 units to be built within Building A, would pay a condominium fee proportionate to their *pro rata* share of expenses, including maintenance for HVAC systems, the building (interior and exterior), and the parking lots (the "Common Elements," and fees to maintain the Common Elements, "Condominium Fees").[16]

---

[12] D.I. 42, Exs. K, X.

[13] D.I. 1, Ex. B.

[14] D.I. 1, Exs. A–B.

[15] *Id.*

[16] D.I. 42, Ex. J (stating that Common Elements ownership is apportioned at 1/226 for each unit owner). Plaintiffs did not participate in the vote for the amendment. *See id.*

5

The Declaration was amended yet again on December 2, 1994, to provide that Unit F-1-A was excepted from paying the costs of heating and air conditioning.[17]

A 2009 amendment to the Declaration apportioned ownership of the Common Elements to the existing unit owners, giving each a 1/181 share, meaning the 45 units to be constructed in Building A were excluded.[18] This was reaffirmed in the latest and operative Declaration, which was amended on May 24, 2013.[19] Though the Governing Documents afford each unit owner a right to attend meetings and vote on matters affecting the Condominium, the Campanellis were neither informed of nor participated in *any* of the votes on amendments to the Governing Documents.[20]

The Condominium's Code of Regulations has also been amended numerous times.[21] While the operative Code of Regulations, dated April 13, 2009, acknowledges that Coffee Run contains 226 units, it does not count the Campanellis'

---

[17] Compl. ¶ 25; D.I. 1, Ex. F.

[18] D.I. 1, Ex. H § 7.

[19] D.I. 1, Ex. I § 7.

[20] D.I. 42, Campanelli Affs. ¶ 9. Mr. and Mrs. Campanelli submitted mirror-image affidavits, so they are cited together as "Campanelli Affs."

[21] D.I. 42, Exs. Q (Original Code), R (Amended Code dated Sept. 21, 1975), S (Amended Code dated June 8, 1989), U (Amended Code dated Jan. 27, 1992), X (Amended Code dated Apr. 13, 2009) (stating the Condominium was originally to consist of 226 units but currently has only 181 *existing* units that each receive one vote and are allocated one share of common element expenses).

to-be-built units among the existing units when addressing the votes entitled to be cast or allocating the Condominium Fees.[22]

### D. The Council Denies the Campanellis' Proposals to Construct Building A and Then Charges the Campanellis Condominium Fees for Unbuilt Units

The sewer work that had been preventing the Campanellis from constructing Building A was finally completed in September 2015.[23] While the record does not reveal when the first offer was transmitted, it appears that soon after the sewer work was completed, the Campanellis began to field several offers from builders who wished to construct Building A.[24] As the offers were received, the Campanellis would submit the "designs and proposals" from the builders to the Council for approval.[25] The Council rejected each submission.[26] According to the Council, none of the submitted designs and proposals complied with the Condominium Plan's specifications.[27]

On May 1, 2018, 28 years after the Campanellis purchased the right to construct Building A and despite previously representing to the Campanellis that it

---

[22] D.I. 42, Ex. X.

[23] D.I. 42, Ex. GG (Letter from New Castle County).

[24] D.I. 42, Campanelli Affs. ¶ 11.

[25] D.I. 42, Campanelli Affs. ¶ 12.

[26] D.I. 42, Campanelli Affs. ¶¶ 13, 14, 19; D.I. 42, Ex. AA.

[27] D.I. 42, Ex. Z.

intended to "commence condominium fees and sewer charges for the 45 Units at such time that services from the present Coffee Run facility are utilized by Building A to any degree," the Council notified the Campanellis that they would be charged Condominium Fees of $110 a month "per Unit" for the 45 unbuilt units in Building A, totaling $4,950 per month.[28] The Council also back-charged the Campanellis these fees for the year prior (July 1, 2017 to May 1, 2018), for an amount totaling $54,450.00.[29]

### E. Procedural History

On May 31, 2018, the Campanellis filed a Complaint against the Council seeking declaratory judgments and an injunction.[30] After completion of motion practice on the Campanellis' request for preliminary injunctive relief,[31] the Council filed its Answer, Affirmative Defenses and Counterclaims to Plaintiffs' Verified Complaint.[32] The parties subsequently entered into several stipulations regarding

---

[28] D.I. 42, Exs. G, H.

[29] D.I. 1, Ex. S.

[30] D.I. 1.

[31] D.I. 2–3, 10–11 (briefing on Plaintiffs' motion to expedite and for a preliminary injunction); D.I. 9, 13–14 (briefing on motion to dismiss); *see also* D.I. 16–18 (Order denying Defendants' motion to dismiss).

[32] D.I. 19.

mediation and then case scheduling.[33]  Upon completion of discovery, the parties

cross-moved for summary judgment.[34]  Oral argument was held on April 29, 2021,

and the case was submitted for decision that day.[35]

## II. ANALYSIS

Under Chancery Rule 56, summary judgment will be granted if the record

bears out "no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."[36] Summary judgment is especially

---

[33] D.I. 22–27, 31–37.

[34] D.I. 39; D.I. 42 (Pls.' Opening Br. in Supp. of Mot. for Summ. J.) ("Pls.' Opening Br."); D.I. 44 (Pls.' Answering Br. in Opp'n to Defs.' Opening Br. in Supp. of Defs.' Mot. for Partial Summ. J.) ("Pls.' Answering Br."); D.I. 48 (Pls.' Reply Br. in Supp. of Mot. for Summ. J.) ("Pls.' Reply Br."); D.I. 41 (Defs.' Opening Br.); D.I. 43 (Defs.' Answering Br. in Opp'n to Pls.' Mot. for Summ. J.) ("Defs.' Answering Br."); D.I. 47 (Defs.' Reply Br. in Supp. of Mot. for Partial Summ. J.) ("Defs.' Reply Br.").

[35] D.I. 52.

[36] Ct. Ch. R. 56(c); *see GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (discussing the standard of review and shifting burdens implicated by motions for summary judgment).  Here, the parties have brought cross-motions for summary judgement.  This normally would implicate Chancery Rule 56(h), which provides that the court "shall deem the [cross] motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions" when the parties have "not presented argument to the Court that there is an issue of fact material to the disposition of either motion." Ct. Ch. R. 56(h).  The parties argued on brief that there were no material issues of fact, but walked back that acknowledgement during oral argument with respect to certain issues relating to back-charged Condominium Fees and the extent to which the Campanellis may build facilities for parking connected to Building A.  Pls.' Opening Br. at 2, 17; Defs.' Opening Br. at 6, 17 ("There are no material facts in dispute in this case."); Defs.' Answering Br. at 35–46; Oral. Arg. Tr. 39:12–15 (Defendants stating that more facts are needed to determine whether Defendants' rejection of Plaintiffs' building proposal was arbitrary and capricious).  While I ultimately conclude that there are

appropriate when the controversy is grounded in the construction of an unambiguous contract.[37] "[A] contract is unambiguous when the agreement's ordinary meaning leaves no room for uncertainty, and the plain, common, and ordinary meaning of the words . . . lends itself to only one reasonable interpretation."[38]

## A. The Campanellis Do Not Owe Back-Condominium Fees

The Campanellis seek a declaratory judgment that the Council may not charge them Condominium Fees because they have not constructed units and so are not unit owners against whom fees may be assessed under the DUPA or the Delaware Uniform Common Interest Ownership Act (the "DUCIOA"). Even if they are unit owners, the Campanellis say, the operative Governing Documents do not authorize the Council to assess Condominium Fees for unbuilt units. The Council disagrees on all fronts.

While the parties have not cited a Delaware case interpreting whether the term "unit" under the DUPA or the DUCIOA encompasses unconstructed units, the DUPA undisputedly contemplates that a condominium's Governing Documents can

---

no genuine issues of material fact with respect to these issues, because the parties suggested otherwise at oral argument, I have applied Chancery Rule 56(c) as the standard of review.

[37] *United Rentals Inc. v. Ram Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[38] *Pearl City Elevator v. Gieseke*, 2021 WL 1099230, at *9 (Del. Ch. Mar. 23, 2021) (internal quotations omitted) (emphasis removed).

10

exempt the owners of unbuilt units from condominium fees.[39] Thus, it is appropriate

to look first to the Governing Documents, which are treated as a contract under

Delaware law, for direction regarding the Campanellis' obligations as owners of

Building A.[40] "The principles governing contract interpretation are well settled.

Contracts must be construed as a whole, to give effect to the intentions of the

parties."[41] And, "where the language of a provision in a condominium's enabling

declaration or code of regulations is clear and unambiguous, this court will afford

that language its ordinary meaning."[42]

The original Code of Regulations, dated September 24, 1973, noted that there

were 226 units in the condominium project; Building A accounted for 45 of those

---

[39] 25 *Del. C.* §§ 2205 ("The percentage of undivided interest in the common elements assigned to each unit shall be set forth in the declaration . . . ."), 2216 (stating that common expenses shall be charged to unit owners according to their percentage ownership in the common elements). The Council admits, and its cited cases interpreting similar statutes in other jurisdictions recognize, that a condominium's governing documents can modify the statutory definition of "unit" for purposes of charging expenses for the common elements. Oral Arg. Tr. 20:13–22:7; *see also, e.g.*, *Aluminum Indus. Corp. v. Camelot Trails Condo. Corp.*, 535 N.W.2d 74, 77–81 (Wis. App. 1995) (recognizing that a condominium's governing documents can modify the definition of unit for purposes of charging common element expenses).

[40] 25 *Del. C.* § 2219 (listing the contents that must be included in a declaration which details restrictions and apportionment of units and common elements); *Council of Dorset Condo. Apartments v. Gordon*, 787 A.2d 723, 727 (Del. Ch. 2001) (treating a condominium's governing documents as contracts).

[41] *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) (citing *E.I. duPont de Nemours and Co., Inc. v. Shell Oil. Co.*, 498 A.2d 1108, 1113 (Del. 1985)).

[42] *Council of Dorset*, 787 A.2d at 727.

units.[43]  The operative Code of Regulations, dated April 13, 2009, excludes the Campanellis' units, stating there are "181 existing units and 181 votes entitled to be cast."[44]  It then ties Condominium Fees to unit ownership, stating "[e]ach Unit Owner shall be entitled to a 1/181 percentage of ownership in the Common Elements" expenses.[45]  Likewise, the operative Declaration, dated May 24, 2013, was "signed by the affirmative vote of at least three-fourths (3/4) of the Unit Owners (i.e., a minimum of 136 Units)."[46]  Consistent with the Code of Regulations, this implies the Condominium comprises 181 units, as 136 is three-fourths of 181. The Declaration further states that each unit owners' share of the Condominium Fees is 1/181, not 1/226.[47]

---

[43] D.I. 1, Ex. J (Original Code of Regulations) art. 1.

[44] D.I. 1, Ex. O art. 2, § 1(a).  At oral argument, the Council argued for the first time that, because the Council never sought the Campanellis consent prior to changing their interest in the Common Elements or obligation to pay Condominium Fees, none of the amendments to the Condominium documents since the initial Declaration were effective under the DUPA. Oral Arg. Tr. 22:17–23:24, 25:16–23.  Consequently, the Council reasons, the original Declaration's contemplation of 226 units stands. *Id.*  Because the Council did not brief this issue in any of their three briefs submitted on the cross-motions, the argument is waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[45] D.I. 1, Ex. O art. 2, § 1(a).

[46] D.I. 1, Ex. I § 7.

[47] *Id.*  I note that the parties do not appear to dispute that the units eliminated from the initial count of 226 units are the units to be constructed in Building A.

The Declaration and Code of Regulations thus unambiguously and uniformly provide that Condominium Fees are to be allocated evenly among each of the 181 *existing* unit owners, thereby conferring on the owners of Building A different rights and obligations than the owners of other units.[48] Indeed, consistent with the Governing Document's plain language, the Campanellis have never received notice regarding unit owner meetings or invitations to vote on matters affecting the Condominium.[49] Because the Governing Documents currently allocate Condominium Fees only to the 181 constructed units in buildings B, C, D and E, the Campanellis do not owe Condominium Fees—past, present or future—under the plain terms of the operative Declaration and Code of Regulations.[50] On that point, the Campanellis' request for declaratory judgment and an injunction restraining the Council from charging such fees is granted.

---

[48] *See* D.I. 42, Campanelli Affs. ¶ 9; *see also* D.I. 1, Ex. O art. 2, § 1(a) (stating that existing units are apportioned a share (1/181) of Common Elements); *see also* D.I. 1, Ex. I § 7 (same); *see also Council of Dorset*, 787 A.2d at 727 (explaining when the language of a condominium agreement is unambiguous, then a standard interpretation of the language will be applied). I note that the amendments providing for the 1/181 apportionment were proposed by the Council and duly approved by the owners of existing units. D.I. 1, Exs. E (Amended Declaration dated Dec. 30, 1991), F (Amended Declaration dated Dec. 2, 1994 H (Amended Declaration dated Apr. 13, 2009), I (Amended Declaration dated May 24, 2013), K (Amended Code dated June 8. 1989), M (Amended Code dated Jan. 27, 1992), O (Amended Code dated Apr. 13, 2009).

[49] D.I. 42, Campanelli Affs. ¶ 9.

[50] D.I. 1, Exs. I § 7, O art. 2, § 1(a).

**B. The Campanellis' Building Plan and Request for Separate Accounting and Billing for Building A Must Be Approved**

The Campanellis seek a declaratory judgment that they may begin construction of Building A in accordance with the designs and proposals in their latest submission to the Council (the "Building Plan"). Specifically, the Campanellis argue: the Declaration's architectural review provision, which purportedly authorizes the Council to reject the Campanellis' Building Plan, is so lacking in standards or criteria that it is invalid under Delaware law; the Declaration Plan, which would appear to restrict the Campanellis' ability to construct a facility for additional parking, is either invalid under Delaware law and the DUCIOA or subject to reasonable modification; and the Council's denial of the Campanellis' proposal to arrange for separate accounting and billing for the to-be-constructed units is arbitrary and capricious. I take up each argument in turn.

**1. The Building Plan**

The Campanellis argue the lack of fixed standards in the Declaration's architectural review provision renders the provision invalid as a matter of law.[51] While "an 'architectural review covenant[]' is enforceable if it articulates a clear,

---

[51] *See Benner v. Council of Narrows Ass'n of Owners*, 2014 WL 7269740, at *1 (Del. Ch. Dec. 22, 2014), *adopted sub nom.*, (Del. Ch. Mar. 16, 2015) (treating a restrictive covenant giving an association or committee authority to review and approve plans as an architectural review provision).

precise, and fixed standard the reviewing body must apply[,]"[52] it "is unenforceable under Delaware law [when there is an] absence of any clear and precise standard governing the review."[53] "Restrictive covenants that give an architectural review committee authority to review and approve plans are suspect because of their tendency to be arbitrary, capricious, and therefore unreasonable."[54] Thus, "to the extent that architectural review is 'based purely on aesthetical considerations,' that review is considered arbitrary and capricious and therefore not reasonable."[55]

The Declaration's architectural review provision is found in Section 17(c), and provides:

> A Unit Owner must obtain express written approval of the Council before making, or permitting to be made, any internal structural installation or alteration, or any installations or changes that alter the external appearance of the Unit. A Unit Owner desiring to make, or permitting to be made, such structural installations, alterations, or changes shall first notify the Council in writing. The Unit Owner shall

---

[52] *Id.*

[53] *Id.* at *9.

[54] *Point Farm Homeowner's Ass'n, Inc. v. Evans*, 1993 WL 257404, at *3 (Del. Ch. June 28, 1993).

[55] *Id.* (quoting *Chambers v. Centerville Tract No. 2 Maint. Corp.*, 1984 WL 19485, at *3 (Del. Ch. May 31, 1984)). The Council asserts (without reference to any authority) that the requirements for specific standards in architectural review covenants (like *Point Farm*) apply to homeowner associations but not to condominium associations. Defs.' Answering Br. at 37–38. That is plainly wrong. *See Benner*, 2014 WL 7269740, at *7 (addressing architectural review as relates to condominiums); *Canal Cokran Homeowners Assoc., Inc. v. Petrone*, 2017 WL 1450168, at *1 n.2, *4 (Del. Ch. Apr. 21, 2017) (same).

furnish the Council with such information and drawings as may be requested.[56]

By its own terms, Section 17(c) contains no "fixed standards" by which the Council would evaluate the Campanellis' Building Plan.[57] Rather, the provision grants to the Council the unfettered, arbitrary power to approve or deny alterations to existing structures, or the construction of new structures. "This Court consistently has held that the absence of a clear, precise, and fixed standard in an architectural review covenant renders that portion of the deed restriction unenforceable."[58] Section 17(c), therefore, must be stricken, meaning, as it stands, the Council is not empowered independently to review and reject the Campanellis' Building Plan.[59]

The Council attempts to salvage its rejection of the Building Plan by arguing that the Declaration Plan (now 48 years old), as opposed to the Declaration, provides fixed standards that conflict with the Campanellis' Building Plan. To be sure, the Declaration states that each building is to be constructed in accord with the

---

[56] D.I. 1, Ex. I § 17(c).

[57] *See Benner*, 2014 WL 7269740, at *1.

[58] *Id.* at *8; *see also Seabreak Homeowners Ass'n v. Gresser*, 517 A.2d 263, 269 (Del. Ch. 1986) ("[W]here the language used in the restrictive covenant empowering the committee is overly vague, imprecise, or so unclear as not to lend itself to evenhanded application, then the grant of authority is normally not enforceable.").

[59] *Benner*, 2014 WL 7269740, at *11.

16

Declaration Plan,[60] and the deed under which the Campanellis acquired the right to construct Building A makes clear that Building A is to be constructed as "particularly shown and described in (1) the Declaration . . . and; (2) the Declaration Plan."[61] And "the court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole."[62] Nevertheless, even assuming the Declaration Plan modifies or accents the Declaration's architectural review provision, it still fails to provide the kind of "clear, precise, and fixed standards" our law requires.[63]

The Council does not dispute that the dimensions set out in the Declaration Plan are described as "approximate" dimensions for the "typical" floorplans, and the

---

[60] *See* D.I. 1, Ex. O §§ 3–4 (The Plat "sets forth the measurements [and] . . . locations . . . with respect to . . . (2) all Buildings and each floor thereof; and (3) each Unit of all Buildings and its horizontal and vertical dimensions. Each Unit is identified on the Plat." Each Building is "any building located . . . on the Parcel and forming part of the Property containing Units . . . as shown by the surveys of the respective floors of said Buildings included in the Plat." each unit "shall consist of the identifying number or symbol of such Unit as shown on the Plat" and "describe[d] . . . by its identifying number or symbol as shown of the Plat.").

[61] The letter the Council sent to the Campanellis as they were considering whether to acquire Building A also states that Building A must be constructed in compliance with the Condominium Plan. D.I. 42, Ex. G ("It is our intention to assure that the recorded plans and specifications on file for the construction of Building A are complied with completely.").

[62] *See Council of Dorset*, 787 A.2d at 727.

[63] *Benner*, 2014 WL 7269740, at *1.

17

Declaration Plan allows that the dimensions may "var[y]."[64]  That qualifying language used in the Declaration Plan suggests that the dimensions and measurements set forth are not defined and are, therefore, imprecise,[65] as alterations can be made to the structures as built.[66]  How submitted plans may "var[y]" from the Declaration Plan, however, is not explained, nor are there standards provided for how the Council will determine whether variances are acceptable.  Indeed, while Buildings D and E are depicted "[a]s [b]uilt," Building A's dimensions are expressly identified as "[p]roposed."[67]

The tentative nature of the Declaration Plan's design for Building A is further reinforced by the Governing Documents.  As noted, Section 17(c) of the Declaration provides the Council with broad discretion to approve structural changes, while both the Declaration and the Code of Regulations allow for separate accounting and billing "[i]n the event that there are substantial differences in the design or

---

[64] *See* Pls.' Opening Br. at 42; *see generally* Defs.' Answering Br. (failing to argue otherwise).

[65] *Approximate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/approximate (last visited July 19, 2021) ("Nearly correct or exact : close in value or amount but not precise."); *Typical*, Merriam-Webster, https://www.merriam-webster.com/dictionary/typical (last visited July 19, 2021) ("Combining or exhibiting the essential characteristics of a group.").

[66] *See* D.I. 42, Ex. 1 § 17(c).

[67] D.I. 42, Ex. C at 1.

construction of a given multifamily building which result in operating costs which are substantially different from the costs of the other multifamily buildings."[68] Those provisions would be superfluous if, in fact, the Declaration Plan (which the Declaration incorporates) was intended to set forth definite, fixed dimensions with which Building A must strictly comply.[69] Because any restrictions in the Declaration Plan must be strictly construed against the Council,[70] the Declaration Plan's vagueness renders it "clearly subject to reasonable modification."[71]

---

[68] D.I. 42, Ex. K §§ 12(b), 17(c); D.I. 42, Ex. X (April 13, 2009 Code of Regulations) art. 9, § 2(b) (restating the Declaration's Section 12(b)).

[69] I note also that, to the extent Defendants would suggest the Declaration and Declaration Plan conflict (they do not), the Declaration controls. *See Murray v. Wang*, 1995 WL 130727, at *4 (Del. Ch. Mar. 16, 1995) ("It is clear from the Act [DUPA] that the Declaration is the principal document to which one must turn in order to determine the developer's intention concerning the property being subjected to a condominium scheme.").

[70] *See Serv. Corp. of Westover Hills v. Guzzetta*, 2009 WL 5214876, at *3 (Del. Ch. Dec. 22, 2009); *Alliegro v. Home Owners of Edgewood Hills, Inc.*, 122 A.2d 910, 912 (Del. Ch. 1956).

[71] *Realty Growth Invs. v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1992). The Council's attempt to distinguish *Realty Growth* because it involved the "tentative placement" of a "future building" fails, as the Declaration Plan was certified in 1973 at a time when many of the Condominium's buildings were yet to be constructed. Defs.' Answering Br. at 42. Indeed, the Declaration Plan describes Building A as "proposed" and uses qualifying language ("approximate," "typical," and "vary") indicating its "tentative" nature. *See* D.I. 42, Ex. C.

In submitting their Building Plan, the Campanellis proposed that Building A's outward appearance would be identical to Buildings B-E, with 45 (smaller) units.[72] The building would be five stories, like the other condominiums, but the first floor would contain a parking garage to provide 45 parking spaces to the unit owners of Building A, which would address what the Campanellis describe as a lack of parking at the Condominium.

Beyond the Council's blanket statement that it would not consider any proposal it deemed out of step with the decades-old Declaration Plan (which, as explained, is subject to reasonable modification), the only specific direction provided by the Council to the Campanellis upon rejection of the Building Plan is that their project must comply with present-day code and must not include the construction of new parking spaces or a parking garage.[73] While the Council attempts to manufacture a dispute of fact by arguing the Condominium has sufficient parking, the present-day New Castle County Code clearly requires 465 parking

---

[72] *See* D.I. 42, Ex. Z. Strangely, the Council insists at various points that they have no definite building plans to evaluate. *See* Defs.' Answering Br. at 37; Oral Arg. Tr. 33:10–15. But the Court has on record the Campanellis' submissions, and the Council did not then object to those submissions on grounds of vagueness. *See* D.I. 42, Ex. Z.

[73] D.I. 42, Ex. Z (Email from Marconi to Rhodunda dated Dec. 1, 2017, stating that "the new building, parking, and unit configuration must strictly comply with the existing conditions subject of course to modern building requirements."); *see also id.* (Email from Marconi to Rhodunda dated May 1, 2018, stating that Defendants will not allow alterations of the physical building as proposed by Plaintiffs).

spaces for a housing complex the size of the Condominium, which currently has only 390 parking spaces.[74] Thus, the undisputed record reveals that the Council directed the Campanellis to comply with "modern building requirements"; the current code requires additional parking to accommodate Building A; and each owner of the to-be-constructed units in Building A will likely own at least one vehicle. Under these circumstances, the Campanellis' parking proposal is a reasonable modification to the Declaration Plan. The balance of the Building Plan is also reasonable, as it complies with the current code (the Council's only other specific directions when rejecting the Building Plan) and it respects the Condominium's outward aesthetic while making only minor changes to the interior.[75]

---

[74] NCC UDC § 40.03.522 (requiring "1.5 [parking spaces] per 1 bedroom dwelling unit, 2 [parking spaces] per 2 or 3 bedroom dwelling unit, 2.25 [parking spaces] per 4 bedroom dwelling unit, 2.5 [parking spaces] per 5+ bedroom dwelling unit; 1 additional guest parking space per 5 dwelling unit").

[75] D.I. 42, Ex. Z (Email of the Building Plan from Rhodunda to Marconi dated Apr. 2, 2018). I note that, in *Nargiz v. Henlopen Developers*, this court held that a Declaration Plan is not valid under 25 *Del. C.* § 2220 until "after the building has been substantially completed . . . ." 351 A.2d 564, 566 (Del. Super. Ct. 1976), *rev'd on other grounds*, 380 A.2d 1361 (Del. 1997). In reversing, the Supreme Court expressly declined to adjudicate the propriety of that ruling. *See Nargiz*, 380 A.2d at 1364. While I have found the Declaration Plan is subject to reasonable modification, and thus need not rest my decision on *Nargiz*'s rationale, the Council does not deny that application of *Nargiz*'s rule would invalidate the Declaration Plan, thereby rendering it unenforceable. *See* Oral Arg. Tr. 30:17–31:9.

## 2. The Separate Accounting and Billing

Finally, the Campanellis seek a declaration that Building A should be subject to separate accounting and billing for "maintenance, with the new building owners being responsible for all maintenance, repairs and upkeep of the new building and the existing unit owners being required for all maintenance, repairs and upkeep of the existing buildings."[76] The Council's sole basis for rejecting this proposal is that it does not understand it.[77] That position is difficult to square with Section 12(b) of the Declaration, which expressly provides that, if substantial differences in the design and construction of a building result in substantially different operating costs, then separate accounting and billing may be required in order "to achieve equity among Unit Owners."[78] That is all the Campanellis have asked for.

The Council previously demonstrated its willingness "to achieve equity among Unit Owners" when it implemented separate accounting and billing for Unit F-1-A because it was not using the same HVAC system as the rest of the buildings.[79]

---

[76] Pls.' Opening Br. at 43–48; D.I. 42, Ex. Z.

[77] Defs.' Answering Br. at 44 ("Plaintiffs simply insist that they must have it and leave it for Council to figure out exactly what they mean, what needs to be done to set it up, and exactly how it will work going forward.").

[78] D.I. 42, Ex. K § 12(b); *see also* D.I. 42, Ex. X (April 13, 2009 Code of Regulations) art. 9, § 2(b) (restating the Declaration's Section 12(b)).

[79] D.I. 42, Ex. O.

Given that the Campanellis' separate accounting and billing proposal is contractually permissible, and the construction of Building A will occur decades after Buildings B–E were built, the Council's blanket rejection of the Campanellis' proposal is clearly arbitrary and capricious.[80]

## C. The Campanellis Will Not Be Awarded Attorneys' Fees

"Delaware courts, and this court specifically, follow the traditional 'American Rule' by which each party bears its own fees and costs" incurred in litigation.[81] As with most rules, there are exceptions. Relevant here, "Delaware courts have previously awarded attorneys' fees where (for example) 'parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims.'"[82] "The party invoking [this so-called] 'bad faith exception' bears the

---

[80] Pls.' Opening Br. at 43–44 (citing D.I. 42, Ex. Z); *see also Dawejko v. Grunewald*, 1988 WL 140225, at *3–4 (Del. Ch. Dec. 27, 1998) (explaining that the arbitrary and capricious standard applies when a restrictive covenant is procedurally or substantively "ambiguous and vague" or "imprecise and discretionary as to create the lik[e]lihood of [an] arbitrary and capricious application"); *Welshire Civic Ass'n v. Stiles*, 1993 WL 488244, at *3 (Del. Ch. Nov. 19, 1993) (explaining that prior approval covenants are restrictive covenants).

[81] *Jacobson v. Dryson Acceptance Corp.*, 2002 WL 31521109, at *16 (Del. Ch. Nov. 1, 2002).

[82] *Nichols v. Chrysler Gp. LLC*, 2010 WL 5549048, at *3 (Del. Ch. Dec. 29, 2010) (quoting *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005)).

stringent evidentiary burden of producing clear evidence of bad-faith conduct by the opposing party."[83]

Nothing in this record suggests the Council delayed the litigation or made any false statements.[84] Nor is there any basis in the record, much less "clear evidence," upon which the Court could conclude that the Council has asserted frivolous claims or defenses or otherwise has acted in bad faith.[85] The Campanellis will not be awarded attorneys' fees.

## III. CONCLUSION

For the forgoing reasons, the Campanellis' motion for summary judgment is **GRANTED**, except with respect to their request for reimbursement of attorneys' fees and expenses, which is **DENIED**. The Council's cross-motion for summary judgment is **DENIED**. The Campanellis shall submit a proposed form of final declaratory judgments, on notice to defense counsel, within the next ten (10) days.

---

[83] *Marra v. Brandywine Sch. Dist.*, 2012 WL 4847083, at *4 (Del. Ch. Sept. 28, 2012) (internal quotations omitted).

[84] *See Nichols*, 2010 WL 5549048, at *3.

[85] *See Marra*, 2012 WL 4847083, at *4.